GEORGE H. SHEPPARD ET AL. V. HIDALGO COUNTY ET AL.

Motion No. 12011 (Cause No. 6826). Decided February 5, 1936.
(90 S. W., 2d Series, 811.)

*James V. Allred,* former Attorney General, *William Mc-Craw,* Attorney General, *Scott Gaines* and *Gaynor Kendall,* Assistants Attorney General, for appellants.

*Robert Lee Bobbitt, Fagan Dickson, Lauri M. Huck, Hicks, Dickson, Bobbitt & Lange* and *Hill & Greer,* all of San Antonio, D. W. *Glasscock,* of Weslaco, and *R. D. Cox, Jr.,* of McAllen, for appellees.

*W. P. Dumas,* of Dallas, *Elcock & Martin,* of Wichita, Kan., *Raymond Edwards* and *Samuel Peterson,* both of San Antonio, *J. T. Adams,* of Orange, and *Fred L. Williams,* of Houston, filed briefs as amici curiae.

MR. JUSTICE CRITZ delivered the opinion for the court.

### ON MOTION FOR REHEARING.

This case is before the Supreme Court on certified questions from the Court of Civil Appeals for the Fourth District at San Antonio. When the case was filed in this Court it was referred to Section A of the Commission. The opinion of the Commission answering the questions certified was adopted by this Court.* 83 S. W. (2d) 649. The case is now before us on motion for rehearing filed by Hidalgo County et al., Appellees.

A reading of the original opinion mentioned above will demonstrate that the questions certified relate to Senate Bill 281, Chapter 162, General Laws 38th Legislature, approved April 2, 1923. Since the rendition of the original opinion herein the Legislature has passed another Act relating to the subject matter of this litigation. This later Act is House Bill 101, Chapter 401, Acts First Called Session 44th Legislature, approved October 17, 1935. An examination of the two Acts above mentioned will demonstrate that since the opinion was rendered in this case it has assumed a new and different aspect from that existing at the time it was certified and at the time our original opinion was rendered. Under such a record, we have decided that the proper thing for this Court to do is to grant the motion for rehearing, dismiss the certificate, and return the record to the Court of Civil Appeals for such further proceedings and orders as to that court may seem proper. It is, therefore, so ordered.

It is further ordered that the opinion heretofore rendered in this cause be, and the same is, in all things withdrawn and held for naught, and the holdings therein shall never be considered as binding on this Court.

Opinion delivered February 5, 1936.

---

*See next page.

That the above opinion may be more fully understood, and for the convenience of the bar, the original opinion by JUDGE GERMAN of the Commission of Appeals is inserted as follows:

In 1923 the Legislature of the State of Texas passed an Act which we are called upon to construe, and owing to the importance and public nature of the question we set the Act out in full:

"An Act releasing the inhabitants of and property of Hidalgo County for a period of twenty-five (25) years from the payment of taxes levied for State purposes because of great public calamities in said county, as provided in Section 10 of Article 8 of the State Constitution, and providing that said county shall vote bonds of said county to prevent the recurrence of such calamities, and in case of the failure of the county to vote such bonds by or before October 1, 1924, said Act shall become null and void, and said taxes collected in the usual manner and paid into the State Treasury, and providing an emergency.

"Whereas, a greater part of the developed portion of the county of Hidalgo was in the years 1904, 1909, 1919 and 1922 greatly damaged by high waters and calamitous overflows, whereby great property damage was done, crops destroyed, and many inhabitants drowned and many other people threatened with the loss of life which caused and constitutes a great public calamity; and whereas, the agricultural, commercial, manufacturing and stock raising interest in Hidalgo County by reason of said calamitous overflows and a possible recurrence thereof require the speedy protection of said property and inhabitants by the proper construction of levees and drainage districts, and for the purpose of aiding and protecting said Hidalgo County and the property and citizens thereof and the citizens of the State of Texas who own property therein and for the purpose of encouraging the continuous development of the property of said Hidalgo County, Texas, and make the same productive of revenues to the State of Texas in succeeding years, now therefore,

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

"Section 1. That because of great public calamities occurring in the county of Hidalgo, the inhabitants of and property in said county, in accordance with Section 10 of Article 8 of the State Constitution, shall be, and are hereby, released for a period of twenty-five (25) years as hereinafter provided,

from the payment of taxes levied for State purposes in said county as follows:

"1. All of State ad valorem taxes levied for State purposes against the inhabitants and property in the county of Hidalgo, including the rolling stock belonging to railroad companies which shall be ascertained and apportioned as provided by law.

"2. Three-fourths of the State occupation taxes levied upon persons, firms, companies and association of persons doing business in the county of Hidalgo.

"Sec. 2. It is expressly provided, and to be held as a condition of the release from the payment of such taxes, that the resident property taxpayers who are qualified voters of Hidalgo County shall by or before October 1, 1924, vote an issue of bonds of said county, in an amount that will require for a period of twenty-five (25) years a tax to be levied upon the taxable property in said county of not less than the State tax rate hereby released, and the maximum amount the county and any subdivision thereof can issue for said purposes; such bonds to be voted and issued as provided by law, as now or hereafter existing, for the purpose of preventing a recurrence of such calamities. Provided that when the sinking fund created under the provisions of this Act shall become sufficient to retire the bonds provided to be issued hereunder, based on the 1924 valuations as an average, this Act shall cease to be operative and the release of taxes hereby made shall cease.

"Sec. 3. The tax assessor of Hidalgo County shall assess for taxation the property and persons, firms, companies and associations of persons in said county in the usual manner as required by law, and the tax collector of said county shall, or shall not, collect the said State taxes, as he may be ordered and directed to do by the Comptroller of Public Accounts as hereinafter provided.

"Sec. 4. A duly certified copy of the order canvassing the returns and declaring the result of the election at which the question of issuing such bonds is voted upon together with satisfactory proof of the issuance and sale of the bonds provided for in Section 2 hereof shall be furnished to the Comptroller of Public Accounts. If such certified order shall be presented to the Comptroller of Public Accounts prior to October 1, 1923, and shall evidence the result of the election as in favor of the issuance of such bonds, and the sale thereof, it shall be the duty of the Comptroller of Public Accounts to

at once order and direct the tax collector of Hidalgo County not to collect the taxes levied for State purposes for the year 1923 and released by this Act, and the said tax collector shall not collect said taxes for said year, and the inhabitants of and property in said county shall, as hereinbefore provided, be released from the payment of said taxes for a period of twenty-five (25) years beginning with and including the year 1923; but if the said certified order is not presented to the Comptroller before October 1, 1923, he shall order and direct said tax collector to collect said taxes for said year and pay the same into the State Treasury as required by law. If said certified order and proof of issuance and sale of bonds shall be presented to the Comptroller of Public Accounts after October 1, 1923, and before October 1, 1924, and shall evidence the result of the election as in favor of the issuance of such bonds, it shall be the duty of the Comptroller of Public Accounts to at once order and direct the tax collector of Hidalgo County not to collect the taxes levied for State purpose for the year 1924 and released by this Act, and the said tax collector shall not collect said taxes for said year, and the inhabitants of and property in said county shall, as hereinbefore provided, be released from the payment of said taxes for a period of twenty-five (25) years beginning with and including the year 1924; but if said certified order is not presented to the Comptroller of Public Accounts before October 1, 1924, he shall order and direct said tax collector to collect said taxes for said year 1924 and pay the same into the State Treasury as required by law. In case of the failure of said county to vote for the issuance of such bonds and to present said certified order to the Comptroller of Public Accounts before October 1, 1924, then this Act shall become null and void and of no further effect."

In pursuance of said Act bonds in the sum of $1,620,000.00 were authorized by a majority vote of the voters of Hidalgo County held for that purpose and were duly issued. In September, 1924, a proper certificate of the facts as required by said Act was made to the Comptroller of Public Accounts of the State of Texas. We take the following additional facts from the certificate of the Court of Civil Appeals:

"For each of the years from 1924 the County Tax Assessor, County Tax Collector, and Comptroller of Public Accounts have caused to be assessed against and to be collected from the owners of property in Hidalgo County (not exempt from taxes by virtue of Section 2 of Article 8 of the Constitution

of Texas), all ad valorem taxes levied by the State of Texas for state school purposes and for state pension purposes. All of said officers so construed said Act, and so performed the duties of their respective offices, that only the State ad valorem taxes for state purposes other than for state school purposes and for state pension purposes remained unassessed and uncollected.

"On September 22, 1934, Hidalgo County, acting by its Commissioners' Court, and certain individuals, as taxpayers, instituted this suit to restrain the levying, assessing and collecting of any and all ad valorem taxes for state school purposes and for state pension purposes, as against any property located in Hidalgo County, Texas, during the twenty-five-year period covered by said Act.

"The District Court, upon a trial without a jury, rendered judgment perpetually adjoining the respective officers and their successors in office from levying, assessing, and collecting, or attempting so to do, any ad valorem taxes whatsoever in Hidalgo County for any state purposes, including state school purposes and state pension purposes, during the period of twenty-five years including and following the year 1924. From that judgment the Comptroller of Public Accounts, the Tax Assessor, and the Tax Collector have perfected an appeal."

The Honorable Court of Civil Appeals for the Fourth Supreme Judicial District has certified to this Court the following questions:

"FIRST. Is said Act in contravention of Section 10 of Article 8 of the Constitution of Texas upon the ground that it is beyond the power of the Legislature to exempt the inhabitants of or property in a county affected by great public calamity from the payment of ad valorem taxes thereafter accruing or thereafter to be imposed?

"SECOND. Is said Act, (attempting to release or exempt the inhabitants of and property in Hidalgo County from assessment and collection of taxes levied and to be levied by general law for state purposes, in consideration of the assumption of a local tax for stated purposes against the property so taxed), unconstitutional upon the ground that it attempts to create an exemption prohibited by Section 2 of Article 8 of the Constitution of Texas?

"THIRD. Should said Act, and, particularly the language 'all state ad valorem taxes levied for State purposes,' be so construed as to mean and include within the terms thereof the release or exemption of the inhabitants of and property

in Hidalgo County from the assessment and collection of ad valorem taxes for state school purposes and for state pension purposes which would otherwise accrue during the period specified by the Act?

"FOURTH. Is said Act, (if construed to relate to ad valorem taxes for state school purposes and state pension purposes), in contravention of Section 7 of Article 8 of the Constitution of Texas upon the ground that it is a commutation of property taxes for a purpose for which the special fund (school and pension) taxes could not be applied?"

The subject of Taxation and Revenue, bearing as it does a vital relation to the State government as well as the property and rights of all the people, is dealt with in a very exhaustive manner in our State Constitution. Article VIII of that document is devoted to it. The matter of taxation has at all times afforded unlimited opportunities for oppression, special privileges, and inequalities. During the entire history of our Nation legislative bodies have been confronted with appeals for release or exemptions from taxes and it has required the strongest constitutional safeguards to prevent abuses.

The makers of our Constitution from the beginning sought to establish as the guiding principle of all tax exactions, demands and enactments the simple formula: "Taxation shall be equal and uniform." In the matter of taxation opportunities for abuses, inequalities and discriminations arise most frequently in certain departments of the practical administration of tax matters and laws. The experience of our State has been similar to that of all others, and all states of the Union have found it necessary to incorporate into their constitutions certain provisions and prohibitions having for their purpose the prevention of wrongs, oppressions and inequalities. Briefly we call attention to the dominant sources of inequalities and discriminations, and the constitutional safeguards which have been erected to prevent, correct or suppress them.

First. The Classification of Properties Subject to Taxation. Our Constitution from the beginning has sought to effectively prevent this being a source of evil and wrong by declaring in Section 1 of Article 8 that "*all* property in this State, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value." Whatever may have originally been the full significance of this provision, it is now recognized as commanding that all property having an ascertainable value shall bear its just proportion of the public taxes of the State. Again, even if this provision were not

originally a mandatory direction that all property *must* be taxed, yet it is definitely settled that it is so comprehensive in its requirements that when property in this State comes within the usual classifications of taxable properties this section by necessary implication excludes its exemption.

Second. Specific Taxation. By this is meant that many times property has been relieved of its just proportion of taxes by being assessed some specific sum, rather than according to its true value, and thus many unjust discriminations have resulted. Our Constitution has not only declared that all property shall be taxed, but that it shall be taxed in "proportion to its value, which shall be ascertained as may be provided by law," thus guaranteeing, so far as practically possible, that there shall be no discrimination in tax burdens because of the varying differences in the nature and value of properties.

Third. Exemptions. The makers of our Constitution early recognized the evils connected with the matter of exemption of property from taxation and guarded against same by the most stringent prohibitions. By Section 2 of Article 8 it is provided that the Legislature may, by general laws, exempt certain enumerated subjects from taxation. In St. Edwards College v. Morris, 82 Texas, 1, it was held that this section did not exempt from taxation, but merely placed "a limitation upon the power of the Legislature to exempt property from taxation." It has often been held that the enumeration of these subjects excludes all other subjects, and that even as to the subjects enumerated the rule of strict construction applies. In addition to these implied inhibitions, such section further provides: "And all laws exempting property from taxation other than the property above mentioned shall be null and void."

Fourth. Releases from Taxes Assessed and Levied. It appears to have been clearly established in this State and all other states that when taxes once were duly assessed and levied against property in the manner provided by general laws for that purpose, and liability became fixed, no authority other than the Legislature could grant relief from or abatement of such taxes. In fact, in many instances it has been held that when taxes have been levied and have become a fixed liquidated demand, acts of municipal authorities, and sometimes even of the Legislature, attempting to compromise a claim for such taxes, or to limit liability therefor, were held void. City of Louisville v. Railway Co., 63 S. W., 14, and Ollivier v. City

of Houston, 93 Texas, 207. In the absence of express constitutional recognition of the right, when there are constitutional provisions for equality and uniformity, as well as a requirement that all property be taxed, acts of the Legislature releasing from or abating taxes levied have been held unconstitutional. State v. Richards, 53 Pac., 981.

"It cannot well be denied that, when the proper tax officers have legally placed upon each individual his share of the public burden of taxation, the Legislature of the state has no right to lift it from him to the prejudice of other taxpayers, or to the detriment of the public credit, either in the form of an abatement before, or in the form of a gift after, collection, or by a return to the taxpayer unburden his forfeited property, for this being done, a deficiency results in the public revenues, which must be supplied by the imposition of additional tax assessments and levies upon the nonfavored class, thereby violating the fundamental constitutional requirement of all taxation, which is that it shall bear equally upon all, with special privileges to none. Simpson v. Warren (Fla.), 143 So., 602; Ranger Realty Co. v. Miller, 102 Fla., 378, 136 So., 546; St. Lucie Estates v. Ashley (Fla.), 141 So., 738; State ex rel. Coe v. Fyler, 48 Conn., 145; State v. Armstrong, 17 Utah, 166, 53 P., 981, 41 L. R. A., 407."

Because of lack of power in municipal and county authorities to grant relief from taxes duly levied, the practice seems to have become prevalent in many states as well as in our own of individuals as well as counties and localities appealing to the Legislature for relief by release or abatement or such taxes. Obviously this afforded many opportunities for discriminations and abuses. In this State, prior to the Constitution of 1876, the Legislature appears to have had plenary power to exempt property and persons from taxation, and as an incident to this power appears to have not only exempted property but to have also relinquished taxes after having been levied. It is obvious, however, that when the power of exemption was taken away, as was expressly done in 1876, except as to enumerated subjects, the power to release was likewise taken away, unless expressly reserved, because it was wholly inconsistent with uniformity and equality in taxation; and because a release from taxes levied is in effect an exemption from taxes. State v. Richards, 53 Pac., 981.

The sweeping provisions of the Constitution of 1876 requiring uniformity and equality, and prohibiting exemptions except as specifically provided, involving as an incident thereto

the power to release or abate taxes, developed a strong contro-
versy over what is now Section 10 of Article 8. See Jones v.
Williams, 121 Texas, 94. It must be kept in mind, however,
that the subject dealt with by that section was the power of the
Legislature to release from taxes already assessed and levied
and which had become a fixed liability against property and
persons. It is obvious, therefore, that the Convention strongly
considered the denial of all power to the Legislature to release
from taxes, but under the influence of public calamities oc-
curring during the sitting of the Convention, finally adopted
what is now Section 10. In order to clearly show the true
purpose of that section as we conceive it to be, we quote
same with certain words emphasized by italics:

"The Legislature shall have no power to *release* the inhabi-
tants of, or property in, any county, city or town from the
*payment* of taxes *levied* for State or County purposes, unless
in case of great public calamity in any such county, city or
town, when such *release* may be made by a vote of two-thirds
of each House of the Legislature."

It is significant to note, we think, that the various Acts
of the Legislature (with possibly one exception) which were
enacted during the years shortly after the adoption of the Con-
stitution of 1876 had the effect of releasing only the taxes for
current years which had already been levied and had become
a fixed liability. In several instances the Acts not only named
the individuals but specified separately the amounts of State
and county taxes remitted. Gammel's Laws, Vol. 8, page
1330; Vol. 9, pp. 117, 291, 813.

We think it clear, therefore, that the purpose of Section 10
of Article 8 was to permit the Legislature to exercise the lim-
ited power only of releasing persons and property from the
payment of taxes already levied in cases of great public calam-
ity; and it cannot be construed as affording affirmative power
to release persons or property from the assessment and levy of
taxes for future years. This is evident from a consideration
of the evils sought to be guarded against, and from the further
fact, which is self-evident, that to release property and persons
from taxes not yet assessed and over a long course of years is
nothing more or less than an exemption from taxes of such
property and persons for such years. The further fact that
this power is to be exercised only in case of great public
calamity plainly suggests its purpose. In times of distress
occasioned by loss of property and lives, and particularly the
loss of crops and other means of support and livelihood, the

burdens of taxes bear heavily upon those who have suffered such misfortunes, and they may be wholly without means of paying the obligations due the State. In such case, the wisdom as well as the favor of the government is exemplified by lifting from the unfortunate ones and their property the burden of existing taxes, thus affording them timely help towards self-recovery. This beneficent purposes, however, cannot justify more than release from the already existing burdens pending readjustment and recovery from the immediate shock and deprivations of the calamity. We cannot believe that this provision of the Constitution was intended to relieve not only from the immediate burdens and distress incident to a great public calamity, but was also intended to assist in rehabilitation over a long course of years and to assist in erecting protecting barriers against further occurrence. Matters of rehabilitation and protection against future calamities and perils are to be provided for by the Legislature and the people under other source of constitutional power.

But counsel for appellees strongly emphasize the contention that the work accomplished by the people of Hidalgo County by means of the bond issue in question was of a great public benefit to the entire State, and was in fact a performance of a duty which the State itself should have performed. This is perhaps true, and the people are to be commended for their action. But if it be conceded that the action of the people of Hidalgo County in voting these bonds and providing for their payment by taxation of their property resulted in the accomplishment of a state purpose and amounted to a contribution, direct or indirect, to the State of sums of money equal to the taxes which would have been assessed for State purposes during the period of twenty-five years, still we do not escape the constitutional provision against exemptions of property from taxation. If the Legislature intended to provide that the acceptance of the benefits by the State of the work accomplished by the bond issue was to be regarded as the equivalent of the taxes for State purposes which would have been paid to the State during the twenty-five year period, then we have a clear case of commutation of taxes, which is condemned by our Constitution.

In the case of Austin v. Gas Company, 69 Texas, 180, an ordinance of the City of Austin which was attempted to release the Gas Company from the payment of taxes for twenty-five years in consideration of the furnishing of gas to the city at reduced rates was involved. The ordinance was held void.

While the decision rests upon the proposition that the Legislature had conferred on the city council the power to commute taxes, nevertheless it is apparent that the court held that the question of whether or not the Legislature itself had the power to commute taxes depended upon the power to exempt, which, at that time, could be done under the Constitution by two-thirds vote. Under the present Constitution the power to exempt, except as to specified subjects, is taken away from the Legislature. The significant language of the opinion which is applicable to the present case is as follows:

"It is urged that the contract in question did not give an exemption from taxation, but that by way of commutation the gas company paid and agreed to pay to the city, through the deductions to be made in favor of the city from the prices paid by other customers for gas, a sum equal to or greater each year than would be the taxes on the company's property, and that, therefore, the contract was not invalid. This proposition we think unsound. The power to commute taxes, as said by the Supreme Court of Louisiana, is but an incident of the power to exempt; and, when the latter does not exist the incidental power must be denied. (City of New Orleans v. Railroad Company, 28 La. Ann., 498; Manufacturing Company v. New Orleans, 31 La. Ann., 447.)"

A similar contract was involved in the case of Altgelt v. City of San Antonio, 81 Texas, 436, and in that case this Court said:

"That the city of San Antonio did not have the power to exempt this property from taxation is well settled in the case of The City of Austin v. Gas Company, 69 Texas, 187. In the same case it was held that the power to commute taxes was but an incident of the power to exempt, and as the latter power did not exist, so the incidental power must be denied."

The case of Louisiana Cotton Manufacturing Co. v. City of New Orleans, 31 La. Ann., 440, cited by this Court in the case of Austin v. Gas Company, supra, is an outstanding one, because it has many times been cited, and because the main opinion was written by Justice White, who afterwards so eminently adorned the Supreme Court of the United States. In that case the State of Louisiana had by legislative Act authorized the commutation of State and city taxes to incorporated companies, whose business was the manufacture of cotton or woolen goods, upon the payment of the sum of $100 to the State and a like sum to the city. In that State the Constitution at that time did not expressly prohibit exemptions, but

specified the subjects of taxation which might be exempted. It was held that this and the other provisions requiring uniformity and equality by implication excluded all other subjects from exemption. Justice White in holding the Act of the Legislature void used the following language which we think aptly appropriate here:

"The power to exempt not being within the legislative authority, except as to enumerated classes, does the act of 1875 create an exemption not covered by the constitutional provision? Certainly, the property is not either church, school, or charitable, and equally certain is it that the *right not to pay taxes is an exemption from taxation.* The law conferring the right so defines it; 'shall be exempt from taxation' is the language of the statute. But it is said the property is not exempt from taxation; the taxes are simply commuted. That the power to commute is forbidden by the denial of the power to exempt has been determined. City v. Lafayette Insurance Co., 28 An., 756; City v. St. Charles Company, 28 A., 498.

"It seems obvious that these decisions are founded on reason, for the right to commute being simply an incident of the power to exempt, the negation of one is the denial of the other. The books, so far as we have been able to examine them, are singularly deficient in definitions of the right to commute. Defined from several points of conflicting thought, it may, we think, be said to be 'a payment of a designated sum for the privilege of exemption, or the selection, in advance, of a specific sum in lieu of an ad valorem tax.' If the first, it is indubitably an exemption; if the second, and this covers the third inquiry proposed, then it is a specific tax, and hence violates the rule of ad valorem, which prescribes that all property shall be taxed according to value. Either point of the dilemma is fatal to the plaintiff's pretensions."

In the case of Hogg v. Mackay, 23 Or., 339, 31 Pac., 779, by the Supreme Court of Oregon, an Act of the Legislature containing the following provisions was involved:

"That if said Williamette Valley & Coast Railroad Company shall, within ninety days after the approval hereof by the governor, file in the office of the secretary of state its agreement, duly executed under its corporate seal, obliging itself to carry all troops and munitions of war of this state required to be conveyed on its road without charge to the state for a period of twenty years from and after such approval, without other compensation than the moneys arising from taxes assessed, levied, or collected on the property of said company,

then, in consideration of said agreement and said services, done, or to be done, for said period of twenty years, said company shall have and receive during all said term all the taxes levied, assessed, or collected, or which might have been levied, assessed, or collected, by the state, upon all its property, real and personal, and said taxes are hereby appropriated therefor."

The Constitution of that State did not contain a provision directly making void exemptions, but did contain the usual provisions with reference to equality and uniformity, and specified the subjects which might be exempted. In holding the Act void, the court, among other things, said:

"While counsel for plaintiff frankly admit that the legislature, under the constitution, had no power to exempt the property of their client from taxation, they urge that section 11 of the act of 1874 is not an exemption of the property from taxation, but a commutation of the taxes, for what the legislature determined to be an adequate equivalent, and therefore is not obnoxious to the constitutional provisions. A sufficient answer to this position is that the legislature cannot do indirectly what it is prohibited from doing directly. The right to commute is simply an incident of the right to exempt, and the denial of the power to exempt must necessarily preclude the existence of the power to commute. As was said by White, J., in Louisiana Cotton Manuf'g Co. v. City of New Orleans, 31 La. Ann., 440, the right to commute may be said to be 'a payment of a designated sum for the privilege of exemption, or the selection in advance of a specific sum in lieu of an ad valorem tax. If the first, it is indubitably an exemption; if the second, then it is a specific tax, and hence violates the rule of ad valorem, which prescribes that all property shall be taxed according to value.' Either view is fatal to plaintiff's contention in this case. The constitution absolutely prohibits the exemption of any property, except for municipal, educational, literary, scientific, religious, or charitable purposes; and, as no part of plaintiff's property is included within any of these enumerated classes, any law which attempts to exempt it from taxation is void, and 'any law which indirectly produces such exemption must be equally void. That cannot be accomplished indirectly which the organic law declares shall not be done directly.' Mr. Justice Field, in Huntington v. Worthen, supra.

"The provisions of our constitution were manifestly intended to require and insure equality in the manner and mode of the assessment and the levy and collection of taxes for the support of the government, and to impose an equal proportion

of these burdens upon all persons within the limits of the taxing district, and, to that end, to prohibit special or class legislation of the character sought to be upheld in this case. If the legislature can, for any consideration it may deem adequate, exempt or commute the taxes on one class of property, or on the property of one taxpayer, it can do the same, with any or all property, and the proportion of the burden of maintaining the government borne by any taxpayers will depend, not on the amount or value of his property, but upon his success in securing advantageous legislation. If such a doctrine should be recognized by the courts, the constitution will put no hindrance to rich and powerful corporations or rich men making contracts with the legislature for perpetual exemption from all the burdens of supporting the government, and the property owner who is unable to obtain such contracts or commutation will be compelled alone to bear such burdens."

In fairness to counsel we may say that they argue in this instance that there was neither an exemption nor a commutation. We call attention to the foregoing authorities for the purpose of showing that this Act necessarily constitutes an attempted exemption or commutation. The very language of the Act leads to that conclusion. The caption declares it to be "An Act *releasing* the inhabitants of and *property* of Hidalgo County for a period of twenty-five (25) years from the payment of taxes levied for State purposes." Section 1 of the Act declares that "the inhabitants of and property in said county shall be and are hereby released for a period of twenty-five (25) years as hereinafter provided from the payment of taxes levied for State purposes in said county." Unless we give the words "releasing" and "released" the restricted meaning of a discharge from a liability already accrued, then it necessarily follows that the "releasing" of the inhabitants and property from taxes for twenty-five years means that no taxes shall be assessed, levied or collected against said inhabitants and property for that period; and what is this but an exemption from taxes?

It is obvious that the provisions of Section 3 related to assessments pending the action of the county on the question of the issuance of bonds, and after proper certificate of the results of the election was made to the Comptroller, no further assessment was contemplated, but thereafter "the inhabitants of and property in said county shall be released from the payment of said taxes for a period of twenty-five years." This manifestly means no further action with reference to assess-

ment, levy or collection of taxes was to be taken. This means exemption. But if not exemption, under the argument of counsel that the county was rendering a value to the state equal to the taxes it would have paid, it necessarily means commutation. Both are condemned by our Constitution.

In the case of Aransas Pass v. Keeling, 112 Texas, 339, an entirely different question was involved. There the Act provided for the assessment and collection of the taxes, and donated same, after collection, to the city. This was held valid under Section 8 of Article 11 of the Constitution. The reference to Section 10 of Article 8 was purely arguendo, as that section was not involved at all.

In concluding this opinion, we think it appropriate to quote briefly from the language of the Supreme Court of Utah in the case of the State v. Richards, supra. The Act there held unconstitutional was one which provided that the County Board of Commissioners "may remit or abate the taxes of any insane, idiotic, infirm, or indigent persons to an amount not exceeding Ten Dollars for the current year." In holding the Act unconstitutional the court used the following language:

"But counsel for the defendants maintains that an abatement of taxes, as provided in the statute, is not an exemption, as provided in the constitution, that 'abatement' does not mean the same thing as 'exemption,' and that, therefore, the statute is not in excess of legislative authority, and is valid. It is true that the terms 'exemption' and 'abatement,' in their literal sense, have different shades of meaning. This is so, to a certain extent, of the meaning of these terms as employed in the constitution and statute; for an exemption prevents any assessment or levy of tax in the first instance, and in that way relieves the property from the burden of taxation, while in the case of an abatement the property is relieved of its share of the burdens of taxation after the assessment has been made and the tax levied. The difference in the sense of these terms therefore relates to the method, rather than the effect; for the ultimate result, whether by exemption or batement, is precisely the same. In either case the property is relieved from the burden of taxation. Now it is apprehended that the intention of the framers of the constitution, by exempting certain property, was not so much to prevent an assessment and levy of tax thereon as to free it from the burden of maintaining the government. When the tax is abated or remitted after it has been levied, the same object is accomplished; and therefore the mandates of the constitution, that such burdens 'shall

be equal and uniform' on all property within the state, except such as is exempt by the fundamental law, and that 'every person and corporation shall pay a tax in proportion to the value of his, her, or its property,' may be violated by either method. It is true that the statute does not permit the batement of all the tax, as does an exemption under the constitution; but it is equally true that if the legislature has power to enact a statute releasing property, not exempt by the paramount law, from a portion of the tax, it has power to enact one abating all the tax on such property. The same legal principles apply in either case. The meaning and intent manifest from the constitution are that no property shall be relieved from the burden of maintaining the government, except such as was defined and specified for exemption by that instrument. No one would contend for a moment that the legislature of this state has power in express terms to exempt property from taxation, other than that enumerated for exemption in the constitution; and yet in the enactment of the statute in question the legislature has undertaken to indirectly exempt property not so enumerated. This is an attempt to do indirectly that which could not be done directly, and the statute therefore is in violation of the constitution, and is void, as in excess of legislative authority."

From what has been said the answers to the questions propounded by the Court of Civil Appeals are obvious. We answer the first and second questions as follows:

The Act in question is in contravention of Section 10 of Article 8 of the Constitution in the sense that said section did not authorize its enactment, and the same is in contravention of Sections 1 and 2 of Article 8 of the Constitution and is therefore void.

It is unnecessary to answer the third and fourth questions.

The invalidity of this Act in our opinion does not in any manner affect the validity of the bonds issued by Hidalgo County, which, according to the record, appear to have been duly and legally issued in accordance with the statutes provided for that purpose.