**Robert S. CALVERT, Comptroller of Public Accounts of the State of Texas et al., Appellants,**

**v.**

**Myrtle KATTAR, Successor Independent Executrix, etc., Appellee.**

**No. 10470.**

Court of Civil Appeals of Texas.

Austin.

April 10, 1957.

Rehearing Denied May 1, 1957.

John Ben Shepperd, Atty. Gen., W. V. Geppert, Marietta McGregor Payne, Asst. Attys. Gen., for appellants.

Childress, Port & Crady, Houston, Hart, Brown, Sparks & Erwin, Austin, for appellee.

GRAY, Justice.

This appeal is from a judgment awarding appellee a recovery of inheritance taxes paid under protest. Art. 7057b, Vernon's Ann.Civ.St.

Calvert Smith died testate on October 14, 1952. His will was filed for probate in Harris County and its probate was contested by Mrs. Mattie Smith, the surviving widow, and John Calvert Dickson, an adopted son. Thereafter an agreement of compromise and settlement was made whereby 2,000 shares of the common stock of Humble Oil and Refining Company were transferred to Mrs. Mattie Smith and the will was admitted to probate with Vivian Smith Roberts as independent executrix.

The estate of Calvert Smith, Deceased, included 31,350 shares of the common stock of Humble Oil and Refining Company which was inclusive of the 2,000 shares transferred to Mrs. Mattie Smith, supra.

In due time the executrix filed an inheritance tax inventory and report showing a total inheritance tax due in the amount of $127,241.19. Thereafter the Comptroller notified the executrix that an inheritance tax of $180,410.85 had been assessed and this sum was paid under protest.

The market value of the above 31,350 shares of stock for inheritance tax purposes on October 14, 1952 is the question to be decided.

The executrix filed this suit, alleged that the assessment of inheritance taxes made by the Comptroller was erroneous and excessive in the amount of $34,864.64 and prayed for recovery of such amount as may be determined should be refunded.

Vivian Smith Roberts died while this suit was pending, Myrtle Kattar duly qualified as independent executrix and was substituted as plaintiff.

At a nonjury trial a judgment was rendered finding the market value of the above stock to be $63 per share and awarding appellee a recovery of $24,439.39 together with the pro rata interest earned. The judgment decreed that the 2,000 shares of stock transferred to Mrs. Mattie Smith should be taxed in the same manner as if said stock had been given to her by the will.

Appellants here present three points. These are to the effect that the trial court erred in: (1) finding and concluding that in determining the actual market value of the 31,350 shares of stock the Comptroller should take into account the size of the block of stock owned and apply the "blockage" rule; (2) finding and concluding that the actual market value of the stock at the date of the death of Calvert Smith was $63 per share, and (3) in holding that the 2,000 shares of stock transferred to Mrs. Mattie Smith should be taxed in the same manner as if the stock had been given to the surviving wife by the will.

The "blockage" rule has been defined as "recognition of the fact that in some instances a large block of stock cannot be marketed and turned into cash as readily as a few shares." Citizens Fidelity Bank & Trust Company v. Reeves, Ky., 259 S.W.2d 432, 433. In Phipps v. Commissioner of Internal Revenue, 10 Cir., 127 F.2d 214, 216, in its discussion of this rule the court said:

"The reasoning on which this theory of valuation is based is that a large block of stock cannot ordinarily be marketed and turned into cash as readily as a few shares; also, that where there is only a limited market for a stock, offering a large block of the stock depresses the market and lowers the price that can be obtained for the stock. The conclusion that flows from this premise is that evidence of sales of small blocks of stock is not a cri-

terion of the value of a large block of the same stock.

"The ultimate place of the 'blockage' theory in the field of valuation has not yet been finally determined. The most that the courts have said is that it is a factor to be considered along with all others in determining value in computing gift taxes under the statute." Authorities cited.

Both cases supra recognize that the "blockage" rule is a factor that may be considered in determining the value of a block of stock for taxing purposes. Also see annotations in 23 A.L.R.2d at page 775 et seq.

The "unit" rule is a method of valuing stock by multiplying the total number of shares by the sale price of one share sold on a licensed stock exchange and ignoring all other facts regarding value. Citizens Fidelity Bank & Trust Company v. Reeves, supra.

Appellants contend that the "unit" rule should be here applied and appellee contends that the trial court was correct in applying the so-called "blockage" rule.

Appellants support their contention by showing that on October 14, 1952 (date of death) the closing price per share of Humble Oil & Refining Company stock on the auction market of the American Stock Exchange was $67 per share.

We have not been cited to any Texas case, and we have not found any, valuing a block of stock for inheritance tax purposes.

Art. 7130, Vernon's Ann.Civ.St., provides for the appraisal of property for inheritance taxes. That statute in part provides that the property shall be appraised

"* * * at its actual market value if it has a market value, and in case it has none, then its real value at the time of the death of the decedent, * * *."

It is not disputed that the stock had a market value on October 14, 1952, and the question is: Did the trial court properly determine such value? All of the stock was subject to the tax and we think that in arriving at the market value of the 31,350 shares it is proper to resort to the accepted definition of market value. That definition as approved by the Supreme Court in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 979, 980, is:

"* * * the price the property will bring when offered for sale by one who desires to sell, but is not obligated to sell, and is bought by one who desires to buy but is under no necessity of buying."

We are concerned with the market value of all the block of 31,350 shares of stock at the date of death of Calvert Smith, however, the parties appear to agree that a reasonable time after that date should be allowed in which to complete the sale in a diligent and prudent manner.

In Helvering v. Maytag, 8 Cir., 125 F.2d 55, 63, certiorari denied 316 U.S. 689, 62 S.Ct. 1280, 86 L.Ed. 1760, the court said:

"As well as any controverted question of administrative law may be settled without declaration by the Supreme Court, it is established that the size of a block of listed stock may be a factor to be considered in its valuation for gift or estate tax purposes. Where, as in this case, the taxpayer affirmatively shows that a block of listed stock to be valued is very great in comparison with the amounts of the stock which have been traded in on the exchange where it is listed, that the block of stock could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation and that the true value of the block of stock is in fact different from the price quotations, then the taxpayer is entitled to have all other proper evidence of the value of the block of stock considered together with the market quotations. The arguments for the Commissioner to the con-

trary have not persuaded us that the rulings of other Circuit Courts of Appeals and District Courts to the stated effect should be departed from."

In Maass v. Higgins, 312 U.S. 443, 61 S.Ct. 631, 85 L.Ed. 940, 132 A.L.R. 1035, the method of valuing property for tax purposes in keeping with standard business practices was approved.

■ It is our opinion that in finding the market value of the 31,350 shares of stock the above definition of market value is to be applied and that the so-called "unit" and "blockage" rules become convenient terms for the application of the facts to the issue presented. That is, those rules are factors to be considered with all other facts and circumstances in evidence.

The evidence heard by the trial court shows, as noted supra, that the price of Humble stock at the close of the market on October 14, 1952, was $67 per share. However the witnesses agreed that the best price obtainable for the 31,350 shares could not have been realized by offering it all for sale at one time. They also agreed that if the 31,350 shares had been sold by an orderly feeding of it into the market over a period of one year from October 14, 1952, it could not have been sold for as much as $67 per share. The witnesses testified to facts which well qualified them to express opinions as to a prudent manner for the marketing of the stock and as to the price it would have brought on the market. One witness said that the stock could have been sold in the period of one year at an average of $63 per share. This same witness said if all the stock had been sold over a period of six months after October 14, 1952, it would have brought "about" $60 to $62 per share. Another witness said that by selling the stock by "the secondary distribution method" $65 per share could have been realized. He defined such system as:

"A secondary distribution is a distribution over the counter by a dealer or group of dealers of a comparatively large block of a previous-issued and outstanding security listed or admitted to trading on an exchange. Such distribution takes place when it has been determined that it would not be in the best interest of the various parties involved to sell the shares on the Exchange in the regular way or by special offering. The distribution generally takes place after the close of the Exchange trading. As in the case of special offerings, buyers obtain the security from the dealer at the net price of the offering, which usually is at or below the most recent price registered on the Exchange, * * *. Had this block of stock been sold via a secondary, the price at which it would have been sold to the dealer or dealers, if there were a group of them, would have been a negotiated price between the owners of the stock and the dealers concerned."

Another witness testified that an orderly marketing of the stock within any reasonable time after October 14, 1952, could not have been accomplished except on the basis of a substantial decline in the price and expressed his opinion that such decline would have been an average of not less than $6 to $8 per share.

The evidence shows that during the time in question the market for Humble stock was what is termed as a "thin" market which was explained as a market not attractive to investors because of dividends paid. The stock was classed as high grade or quality stock attractive to long range investors who were not interested in immediate income.

The period of time from October 14, 1952, to October 14, 1953, showed a declining market for Humble's stock and on October 14, 1953, when 1,700 shares were offered the closing price was $54 per share.

The finding by the trial court that the value of the stock was $63 per share is well within the values of said stock as testified to by the witnesses.

In appellants' brief they say that:

"* * * the trial court clearly erred in holding that the blockage rule should be applied to reduce the stock exchange price on the valuation date because (1) there was no evidence of any necessity or probability of having to place any large block of the 31,350 shares on the market and (2) the undisputed evidence shows that no large block of said stock has ever been placed on the market."

A similar argument was advanced in Helvering v. Maytag, supra, and was disposed of by the quotation from that case supra.

Appellants say that since September 1, 1934, it has been the consistent departmental construction to value shares of stock for inheritance tax purposes by applying the unit rule, that is, by multiplying the number of shares by the listed value of the shares on the stock exchange at the date of death. Such listing price is evidence of value and in controverted cases is to be considered with all other facts and circumstances in evidence. In the case before us the market value of the stock at the date of death of Calvert Smith was directly put in issue and it was determined that the listed value of the stock was not its market value. Under such circumstances we think the departmental construction is not controlling and that it must yield to the judicial determination of an issue of fact.

In Crane v. Mann, Tex.Civ.App., 162 S.W.2d 117, er. ref., a will and codicil devising all of the testator's property to his sister was offered for probate, its probate was contested by testator's son and a compromise judgment was entered admitting the will and codicil to probate and setting a part of testator's property over to the son. Thereafter the Comptroller assessed the entire estate for inheritance taxes against the beneficiary named in the will. The assessment was upheld. The court said that re-

gardless of the compromise agreement the will was probated and by its terms the property vested, that by the compromise the beneficiary agreed for the contestant to take a part of the property which the will gave to her and thereby purchased her peace and unquestioned title to the balance of the property.

The facts before the court in the case supra are similar to the facts here, the holding received the unqualified approval of the Supreme Court, it is controlling here and requires that appellants' point 3 be sustained.

The judgment of the trial court insofar as it adjudged the market value of the 31,350 shares of stock to be $63 per share with a refund of taxes accordingly is affirmed. Insofar as the judgment decreed that the 2,000 shares of stock transferred to Mrs. Mattie Smith should be taxed in the same manner as if the said stock had been given to her by the will is reversed, and judgment is here rendered that the 31,350 shares of stock shall be taxed as passing under the will.

Accordingly the judgment of the trial court is in part affirmed and in part reversed and rendered.

Affirmed in part and in part reversed and rendered.

HUGHES, Justice (dissenting in part).

"What is 'justice' in the matter of taxation? It is that all property shall bear its just proportion of taxes. In the language of the Constitution that:

"'All property in this state, whether owned by natural persons or by corporations, * * * shall be taxed in proportion to its value.' Article 8, § 1.

"It is the 'object' of our tax laws to carry into effect this constitutional provision, which accords with the dictates of justice." [1]

1. Judge Jenkins for this Court in Von Rosenberg v. Lovett, Tex.Civ.App., 173 S.W. 508, 513, writ refused. See also Sheppard v. Hidalgo County, 126 Tex.

The "dictates of justice" have been reversed by the majority. No longer shall identical pieces of property bear their just proportion of inheritance taxes or be taxed therefor in proportion to their value. The rule they establish is that the more corporate stock one has the less inheritance taxes, in proportion, one will have to pay.

I cannot subscribe to such tax philosophy even though it has been apparently approved by some Federal courts and the courts of a few other States. There are, however, contrary decisions.[2]

On submission of this case I inquired if this "blockage" principle had ever been applied to a herd of cattle or a flock of sheep. The reply was negative so far as counsel knew. Yet it is undeniably true that if all the cattle on the King Ranch were dumped on the San Antonio market on the same day the market could not absorb them without loss.

I doubt if there is any market for herds of cattle or flocks of sheep considered as entities. The evidence here negatives a market for these Humble shares considered as a block. Certainly there is no evidence of similar sales upon which to predicate market value. If there is no market value then resort should be made to "real value" as required by Art. 7130, V.A.C.S.

The adoption of the "blockage" rule would lead to uncertainty, inequity and confusion. Take this case. Humble has 36,000,000 shares of stock of which about 1,400 change hands daily on the stock market. Two stock experts testified, Mr. R. N. Edleman for appellee, Dr. J. C. Dolley for appellant. We quote from Mr. Edleman's testimony:

"Q. Now, this estate which is a party to this suit, that is, the estate of Calvert Smith, Deceased, as you know, owned 31,350 shares of Humble stock. Based upon your knowledge of that stock over the years and your experience in liquidating large blocks of stock of various types of companies, do you have an opinion as to the effect upon the price of that stock, had the 31,350 shares been marketed in an orderly way over a reasonable period of time following October 14, 1952? I have just asked, Mr. Edleman, if you have an opinion? A. Yes, I would think that the stock would have to be sold at from a five to a ten percent discount, depending on the length of the period.

\* \* \* \* \* \*

"Q. Well, if the 31,350 shares were, had been offered over a period of six months following October 14, 1952, in an orderly liquidation by offering each day some shares in an effort to convert the entire block into cash within six months, what, in your opinion, Mr. Edleman, would have been the average price per share that could have been obtained from that block over that period? A. I would estimate about $60.00 to $62.00 a share. That is assuming that they would add to the daily sales 250 to 350 or 400 shares, which would have been necessary to liquidate it over that period of time.

"Q. That would be between 33⅓ and 25% more stock offered per day on the market than was ordinarily offered during the period? A. Well, the average during the period was 1300-and something shares, so it would be in the neighborhood of 25% of the additional stock being offered.

"Q. If that period of time, instead of six months, if the estate had to

550, 83 S.W.2d 649. I recognize that our inheritance tax is a privilege and not an ad valorem tax and hence is not controlled by equal and uniform requirement of Art. 8, Sec. 1 of our Constitution, Vernon's Ann.St. State v. Hogg, 123 Tex. 568, 72 S.W.2d 593.

2. State v. Wagner, 1951, 233 Minn. 241, 46 N.W.2d 676, 23 A.L.R.2d 762; Florida National Bank v. Simpson, Fla., 59 So.2d 751, 33 A.L.R.2d 581.

convert that stock into cash within three months after October 14, 1952, what price per share, in your opinion, could in all reasonable probability have been obtained for the entire block? A. There again, Humble stock has a very thin margin, and the prospective buyer would know it, and I would say it would take a 10% discount to move a block of that size, which would be around the $60.00 a share level.

"Q. That is 10% less than the value on the date of death? A. Yes, sir.

"Q. Of the $67.00 per share? A. Yes, sir.

"Q. If there had been a period of a year given to liquidate the holdings of this estate, that is, from October 15, 1952 to October 14, 1953, what, in your opinion, would have been the average price per share that you could in all reasonable probability have obtained for the entire block? A. Of course, that would have been the pressure less from day to day, and you probably could have sold the stock for around an average of 63, if you were given a year. That is, of course, provided that you didn't run into a declining market, which we did during that period. I would have to assume a stable market, which you didn't have for Humble during that period."

Dr. Dolley testified:

"Q. This statement shows, as has been stated, the tradings in Humble stock on the American Exchange during the period April 1, '52 through December 31, '53. It shows the volume of shares sold on the market during this period. It shows that 36,000,000 shares of stock have been issued and are outstanding, of which some 26,-000,000 are owned by Standard Oil Company of New Jersey, and some approximately 10,000,000 by others. It

also shows that the total shares traded during the period covered by the Affidavit is 604,400 shares. Now, in addition, during this period the exhibit gives the price range of Humble stock on a daily basis, with figures which show the opening price, the high, the low, closing price and the volume traded per day through the period. Now, since you have already studied these figures, Dr. Dolley, in view of the figures contained in this exhibit, and assuming that these figures are true and correct, in your opinion, would it have been possible for 31,350 shares of stock to have been marketed within a year, without depressing the price? A. If that stock had been marketed in what is called an orderly manner, which would mean, I think, in from 100 to 500 shares, at slightly irregular intervals, I think the sales would have had a *neglible* effect upon the market price of that day.

"Q. I wonder if you could go further and say that the same would be true had the stock been marketed within a six-months period? A. I think so. I think the same statement would hold."

What is a reasonable time within which to market stock? The trial court and the majority apparently accept one year as such period since the $63 value made by Mr. Edleman is on that basis. Is this correct?

What is a block of stock? We learn from this decision that 31,350 shares of Humble stock is a block. How about 30,000 shares? If 30,000 shares is not a block then their market value (30,000 x $67) should be taxed and the "blockage" value applied to 1,350 shares only. If one share of stock is conceded not to constitute a block, as surely it must be, then I would tax that one share at its true market value of $67.00 regardless of the value given the remaining shares of the block. Unless one share of Humble stock constitutes a block then

the majority opinion permits that one share to escape its just tax burden.

We have two expert witnesses here, both eminently qualified, yet they reach opposite conclusions from the same hypothetical facts. McCormick and Ray in their Texas Law of Evidence, 2d Ed., Sec. 1405, say:

"The fact that practically all expert evidence comes from a biased source has generated a general distrust of it."

Why in view of difficult problems the "blockage" rule presents should we abandon the simple, fair, non-discriminatory method of evaluating corporate stocks, one or a millon, and adopt one which leaves the State at the mercy of experts who speculate about the effects of sales never made nor contemplated.

I would reverse and render the judgment below in its entirety and therefore respectfully dissent in part from the majority opinion.

