ROBERT L. CLAUSE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3907. Promulgated August 28, 1945.

*William Wallace Booth, Esq.*, and *A. G. Wallerstedt, C. P. A.*, for the petitioner.

*Homer F. Benson, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge*: The petitioner reported on his gift tax return for 1941 that the 3,000 shares of stock which he gave in 3 separate gifts on July 3 had a value of $231,000, and that the 6,000 shares which he gave in 3 separate gifts on September 5 had a value of $462,000. The

Commissioner, in determining the deficiency, held that the total value of the 3 gifts made on July 3 was $234,375, and that the total value of the 3 gifts made on September 5 was $474,750. The only error assigned is the action of the Commissioner in increasing the values over the amounts reported. No question of an overpayment is raised, although the petitioner argues that the value of the shares was even less than the amount reported.

The annual reports of the company for the years 1934 through 1944 were received in evidence, and the petitioner devotes a portion of his brief to an argument that the value of the stock as shown by the books, including the earnings and dividends record, was much less than the value reported by the petitioner on his gift tax return. However, he does not ask the Court to find a value in accordance with these calculations, and we agree with his inferential concession that no such finding would be proper and that there must be some explanation not shown by the record of the discrepancy between figures resulting from these calculations and the higher prices at which all agree the stock was selling and at which the stock here in question could have been sold. However, the material contained in these reports has been given careful consideration and sheds some light on the value of the stock.

The petitioner seems to place his chief reliance upon the testimony of several of his witnesses, who described methods employed in selling large blocks of stock and gave two instances in which the method of secondary distribution had been used to transfer two blocks of Pittsburgh Plate Glass Co. stock into the hands of new owners. They gave their opinions as to the best method for disposing of blocks of stock and of the value of the stock here in question. They recognized that the Curb Exchange market for the stock at the time of the gifts was fair in every way and was not affected by any unnatural influence or deceitful manipulation. Their opinion was that large blocks of Pittsburgh Plate Glass Co. stock could have been disposed of to best advantage on the dates of the gifts here in question by using the secondary distribution method, whereby some dealer in securities of this character would agree with the seller to take the block of stock at a price from one to several points under the price at which the stock closed on the market on the day in question, with the intention of selling the stock before the market opened on the next day to ultimate purchasers at the closing price. This would mean that the seller would sell to the dealer at somewhat under the closing market price; the dealer would then get in touch with its own clients, and with other dealers, who would then get in touch with their clients; and, when enough clients had indicated their willingness to buy at the closing market price, the buying dealer would distribute to the secondary distributors a corresponding number of shares. The buying dealer

would retain a portion of the difference in price for its own profit and would allow the dealers who had actually found ultimate purchasers a somewhat larger portion of the difference in price. The witnesses by this method arrived at the opinion that the value of a large block of stock to an owner would be the closing market price on the day in question, minus a "concession" of from one to several points, depending upon the size of the block involved.

The record shows an instance in 1942 where the concession on a block of 1,700 shares of Pittsburgh Plate Glass Co. stock was fixed at $1, and also an instance in August 1943 where the concession on a block of 3,740 shares of Pittsburgh Plate Glass Co. stock was fixed at $2.50. The evidence indicates that the seller of the block of 3,740 shares was under no compulsion to sell, and, although the evidence is not clear, we think it also fair to assume that the seller of the block of 1,700 shares was under no compulsion to sell.

There is no evidence in the record of the closing market price of the Pittsburgh Plate Glass Co. stock on the date of either gift. There is evidence that substantial increases in the offering of the stock could be absorbed by the curb market without depressing the current price of the stock. For example, the figures for July 8 were, low 78, high 78½, 500 shares traded, and those for the following day were, low 78½, high 80, 1,500 shares traded. The evidence also shows that within a very few days after the July 3 gifts of a total of 3,000 shares, 3,200 shares were actually sold on the New York Curb Exchange at average prices in excess of 78⅛, the unit value which the Commissioner has assigned to the shares here in question. The evidence also shows that the average price at which shares actually sold on the New York Curb Exchange for a considerable period both before and after July 3 was 78⅛ or better, and that the price of the stock was generally increasing from the latter part of June through July, during which time more than 10,000 shares of the stock were sold. Somewhat similar comments could be made in regard to the situation at the time of the second gifts on September 5, 1941, although it is a fact that after that date the New York Curb Exchange prices began to fluctuate somewhat more and a decline in price set in later in September which carried the stock down to the middle 50's in December. There were also some sales of the Pittsburgh Plate Glass stock on the Pittsburgh Stock Exchange, the details of which are not shown in the record.

The Commissioner says that "value," as used in the law, means the fair market value of each gift on the date it was made, and "fair market value" means the price which would be agreed upon by a willing buyer and a willing seller, each with adequate knowledge of the facts and neither acting under any compulsion. He insists that the very best evidence of the value of each gift is the price at which

other shares of the same stock actually changed hands in an open and fair market on the dates in question. He goes even further and argues that no evidence of other value was admissible in the absence of evidence that the New York Curb Exchange market was unduly influenced and, therefore, not a "fair" market. Nevertheless, other evidence of value was admitted, properly we think, and has been carefully considered. The Commissioner argues that the price received by a seller through secondary distribution is not the same as the fair market value of stock. There is no indication of a desire on the part of anyone to sell the stock here in question, and the value which he criticizes does not take this into consideration. That is, it does not give consideration to the right of retention which an owner has, and it also does not give due consideration to the fact that anyone desiring to purchase the stock, even under the secondary distribution method, would have to pay a current market price. It would give a value less than the amount someone desiring to purchase the stock would have to pay.

We have had in mind not only the evidence discussed herein, but also all the other evidence in the record. We have also had in mind the rule that the Commissioner's determination is presumed to be correct until the mind of the fact finder, here the Court, is moved naturally to some other conclusion by a fair preponderance of the evidence. Determination of a value of property is always difficult and is particularly so in a case like this, where the parties are not very far apart on the unit values per share and where there is yet room for considerable difference of opinion. It is the duty of the Court to find from the evidence a value for each of the six separate gifts. *Lawrence C. Phipps*, 43 B. T. A. 1010; affd., 127 Fed. (2d) 214; *John J. Newberry*, 39 B. T. A. 1123; *Sewell L. Avery*, 3 T. C. 963. Such findings have been made after due consideration of all of the evidence in the record.

*Decision will be entered for the respondent.*