## STATE v. MILTON E. WAGNER AND OTHERS.[1]

February 23, 1951.

No. 35,221.

*Cummins, Cummins & Hammond* and *Joseph Rapkin,* for appellants.

*J. A. A. Burnquist,* Attorney General, and *Joseph S. Abdnor,* Special Assistant Attorney General, for the State.

LORING, CHIEF JUSTICE.

Else Froedtert Lyng, a resident of Minnesota, died testate March 2, 1943. The inventory of assets in her estate included 97,823 shares of common stock of the Froedtert Grain & Malting Company, Inc.,

[1]Reported in 46 N. W. (2d) 676.

then the second largest malting company in the world. At the time of decedent's death, the Froedtert company had approximately 420,000 shares of common stock outstanding, so that decedent's shares represented about 23.29 percent of the total number of shares outstanding. On the same date, decedent's brother, Kurtis R. Froedtert, owned approximately 184,302 shares of common, so that his holdings represented approximately 43.86 percent of the Froedtert common stock. The remaining 32.85 percent of the Froedtert stock was divided among numerous smaller shareholders.

August 12, 1943, appraisers, appointed under the provisions of M. S. A. 525.331, filed an inventory and appraisal of the property in decedent's estate. This appraisal fixed the value of the 97,823 shares of Froedtert common stock at $8½ per share. The commissioner of taxation in Minnesota filed objections to this appraisal under the provisions of § 291.21. January 6, 1948, after several intermediate hearings and orders, the probate court of Hennepin county fixed the value of the Froedtert stock at $8½ per share, thus affirming the appraisal filed on August 12, 1943. The commissioner then petitioned for a redetermination and reassessment of the inheritance tax assessed by the probate court's order of January 6, 1948. March 17, 1948, the probate court denied the commissioner's petition. The commissioner then took an appeal from the probate court's order, and a trial *de novo* was had in the district court for Hennepin county. September 13, 1949, the district court reversed the probate court's order and determined the value of the Froedtert stock to be $11⅛ per share. The executors of Mrs. Lyng's estate then moved for amended findings of fact and conclusions of law or for a new trial. This motion was in all respects denied, and the case is here on appeal from the district court's order denying the executors' motion for a new trial.

The principal question presented for decision here is whether there is sufficient evidence to support the district court's finding that the value of each of these shares of Froedtert common stock was $11⅛ rather than $8½ or some other amount. This question presents the

problem of how the value of corporate stock is to be determined **for** inheritance tax purposes.

■ The pertinent statutory provision here is M. S. A. 291.23, which states:

"Every inheritance, * * * upon which a tax is imposed under this chapter shall be appraised at its *full and true value* immediately upon the death of decedent, * * *." (Italics supplied.)

The statutory definition of "full and true value" is found in § 272.03, subd. 8, which states:

" 'Full and true value' means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment; being the price which could be obtained at private sale and not at forced or auction sale."

None of the terms used in our case law to interpret or paraphrase the words "full and true value" are very helpful in giving these words any new content or added precision. It has been stated that "full and true value" means "appraised money value." In re Estate of Bigelow, 199 Minn. 239, 242, 271 N. W. 459, 460. In two cases, it was stated that our inheritance tax is imposed upon the "clear value" of the property. State ex rel. Hilton v. Probate Court, 143 Minn. 77, 80, 172 N. W. 902, 903; State ex rel. Smith v. Probate Court, 139 Minn. 210, 166 N. W. 125. With reference to our general property tax provisions relating to assessment of real estate, the inverted terms "true and full value"[2] have been held to mean market or sales value as distinguished from cost price or intrinsic value. State v. Penn Mut. L. Ins. Co. 198 Minn. 115, 269 N. W. 37; Kalscheuer v. State, 214 Minn. 441, 8 N. W. (2d) 624.

The parties in this case have professed to agree that "full and true value" is the price at which the property to be valued will

[2]A comparison of Mason St. 1927, § 1980(5), with M. S. A. 272.03, subd. 8; of M. S. A. 291.02 with M. S. A. 291.23; and of Mason St. 1927, § 2306, with M. S. A. 291.23 will disclose that the words "true and full value" and the words "full and true value" are used interchangeably and with synonymous meaning in our statutes throughout the field of taxation.

change hands between a willing buyer and a willing seller, both being well informed of the pertinent facts and neither being under any compulsion to buy or sell. Although this formula has been frequently used by the courts,[3] in valuation cases it has also been severely criticized by some legal writers as being singularly unrealistic and unhelpful.[4] What is attempted by application of this formula is, of course, to fix a hypothetical fair market price where no fair market for the particular item of property exists in fact. As Judge Amidon of the court of appeals once stated in North American Tel. Co. v. N. P. Ry. Co. (8 Cir.) 254 F. 417, 418:

"The term 'market value,' as the words fairly import, indicates price established in a market where the article is dealt in by such a multitude of persons, and such a large number of transactions, as to standardize the price. Proof of such a market value can only be made by one of the recognized methods of proving the price current in a market. Individual dealings are not competent to prove it. The term is, however, frequently used in a figurative sense, as meaning the fair or reasonable value of the property—that is, such a value as the property would have if it were dealt in according to the practices of a market overt."

Although this court in State v. Penn Mut. L. Ins. Co. 198 Minn. 115, 269 N. W. 37, held that "true and full value" means market or sales value as distinguished from cost or intrinsic value, it is obvious from the facts of that case that the court could not have been referring to an actual market value, for, in that case, the court was reviewing a valuation of real estate for which no market ex-

[3]In Havenmeyer v. United States, 103 Ct. Cl. 564, 59 F. Supp. 537, 549, certiorari denied, 326 U. S. 759, 66 S. Ct. 138, 139, 90 L. ed. 456, the court referred to this test as "universally accepted." See, also, Standard Oil Co. v. Southern Pac. Co. 268 U. S. 146, 45 S. Ct. 465, 69 L. ed. 890; People ex rel. Rhodes v. Turk, 391 Ill. 424, 63 N. E. (2d) 513; Estate of Nieman, 230 Wis. 23, 283 N. W. 452.

[4]See, Rice, *The Valuation of Close Held Stocks: A Lottery in Federal Taxation*, 98 U. of Pa. L. Rev. 367, 370; Hamburg, *Tax Valuation of Real Estate, Stock and Goodwill*, Inst. Fed. Tax. 1947, 145.

isted at the valuation price. The court there stated (198 Minn. 118, 269 N. W. 38):

"'* * * When property does not move, whether from want of willing sellers or willing buyers, its sales value in money must necessarily become much a matter of judgment based upon many factors, whose weight may not influence alike the minds of persons qualified to judge. The one upon whom the duty eventually falls to determine such value must fix it 'at such sum or price as he believes the same to be fairly worth in money.'"

It is perfectly obvious that where there is no standardized market for a particular kind and quantity of property a reference to the usual selling price or market value is not a reference to the actual price at which it would sell if offered for sale on a given day. It is quite clear that the old jingle which says that "the value of a thing is the price it will bring" does not state an adequate formula to determine the value of property for all purposes.

It appears to us that the principal error into which the parties here have fallen is one of assuming that the full and true value of the Froedtert stock is to be determined by reference to the price at which the stock would have actually sold on the date of decedent's death. Although both parties have voiced approval of the so-called "willing buyer-willing seller" formula for determining value, their agreement is more apparent than real. The state's major reliance on the fact that 100 shares of Froedtert stock sold on the New York curb for $11⅛ per share on the day of Mrs. Lyng's death is indicative that it seeks to value this stock at an actual market value, which may or may not be representative of its full and true value, rather than at a hypothetical fair market value. On the other hand, appellants, while purporting to apply the hypothetical formula, have assumed a hypothetical willing seller, but have refused to recognize the existence of a hypothetical willing buyer. They have done so by resting upon testimony of their witnesses that, with reference to 97,823 shares of Froedtert common stock, no willing buyers existed on the date of decedent's death except as they could have been

solicited at considerable expense by use of brokers, investment houses, or other agencies which buy and sell large blocks of stock.

Since the average daily volume of trading in Froedtert common stock over a three-year period immediately preceding Mrs. Lyng's death was small[5] in comparison with the total number of shares outstanding, and since only 100 shares were sold on the New York curb the day she died, we should not hold that the market price of $11⅛ per share for Froedtert stock on the day of Mrs. Lyng's death is to be taken as the sole basis for determining its "full and true value."[6]

Nor can we agree with appellants' contention that the "full and true value" of this block of stock should be determined by reference to what the entire block actually could have been sold for on the date of decedent's death. The uniform testimony of appellants' witnesses was that this large block of Froedtert stock could actually have been sold only at wholesale prices and that wholesale purchasers would have paid somewhere between $8.25 and $9.25 per share for it. Each broker, underwriter, and investment banker who testified, as appellants' witness, indicated that in figuring the price he could pay for Froedtert stock he would fix the retail price a little below the existing market price of $11.18 and would then deduct his profit and his expenses in selling at retail.[7] Appellants'

---

[5]With approximately 420,000 shares of Froedtert common stock outstanding, the average daily volume of trading was 40½ shares during the period from 1940 through 1942; 1,700 shares were sold on the New York curb during the first two months of 1943, and 550 shares were sold during the first four days of March 1943.

[6]Wood v. United States, 89 Ct. Cl. 442, 29 F. Supp. 853; Du Pont v. Deputy (D. C.) 26 F. Supp. 773; Goldwasser v. Commr. Int. Rev. 47 B. T. A. 445, affirmed (2 Cir.) 142 F. (2d) 556; Staley v. Commr. Int. Rev. 41 B. T. A. 752, appeal dismissed December 21, 1940.

[7]In Estate of William Maxwell, 3 T. C. M. (CCH) 1207, the court held that fair market value is not demonstrated by what a dealer would hypothetically be willing to pay for securities upon the assumption that he would thereafter sell them at a higher price to the investing purchaser, either by direct sale or through a process of secondary distribution. See, also, Clause v. Commr. Int. Rev. 5 T. C. 647.

witnesses testified that they would consider all other pertinent factors bearing on value of the stock, but it was made clear in their testimony that the general procedure for calculating the wholesale price was as indicated above. Now, we take it to be a well-recognized law of economics that any attempt to buy or sell a large quantity of any product on a given day is likely to have the effect of raising or lowering the price to an abnormal figure. If an underwriter or similar agent is hired to market a large quantity of a particular item so as not to depress the price, or if the items are sold to an underwriter or other wholesale purchaser, the price which the seller actually receives will be something less than the prevailing retail price. The difference in realization price to the seller between dumping a large quantity of an item on the market and selling to wholesalers or using underwriting services is merely one of degree. In both cases, the seller realizes something less than the going retail price, and the wholesaler is used mainly because the cost of his services is less than the cost of price decline that would result from flooding the market. Even where a broker is used, the seller realizes something like a forced-sale price. He is forced to take the lower price offered by underwriters because the price on the retail market would be even lower if he were forced to sell there on a given day. Aside from the admonition in § 272.03, subd. 8, against fixing "full and true value" by reference to a forced-sale price rather than by reference to the usual selling price, there are numerous reasons why we think that the wholesale price of a large block of stock is not a factor that should be considered in determining its full and true value.

One of the principal arguments to be made in favor of the so-called "blockage theory" in the valuation of corporate stock is that, with reference to stocks which executors actually find it necessary to liquidate, realization prices, however depressed by the procedure of liquidation, are the only values of significance to the beneficiaries. Even if these prices do not reflect "fair market values," they are the prices which the executors receive and, consequently, should be accepted by the taxing authorities. This argument for the

blockage rule is greatly undercut by the rule in this state that, where property left by a testator is properly sold during the course of administration for less than its appraised value in order to pay specific legacies, the difference is deductible for inheritance tax purposes as an expense of administration.[8] This rule would apply to the present case if, in the course of administering the estate, it becomes necessary to liquidate certain assets of the estate in order to effectuate the purposes of the testator and to satisfy legal requirements. The rule, of course, assumes a bona fide sale and not a "wash sale" for purposes of showing a deductible loss to the estate.

If taxpayers are protected by our law in those cases where stock must be sold at a loss in the course of administration, their only other concern is for those shares of stock which are retained. As to blocks of stock which are retained, their value to the recipient taxpayer is quite as likely to exceed the current market price of smaller blocks as it is to fall below those prices. That is especially true where, as here, the stocks give an additional increment of control in the corporation to the recipient of the shares.[9] This case presents a simple illustration of how dubious it is to assume, as advocates of the blockage rule do, that the beneficiary of an estate must and will sell whatever he receives.

---

[8] In re Estate of Bowlin, 189 Minn. 196, 248 N. W. 741.

[9] In the present case, there is every indication that Mr. Kurtis R. Froedtert, who, as residuary legatee, is most likely to receive this stock, will retain it. All the other stocks and securities in decedent's estate except the Froedtert stock have been sold. Decedent's will gives Mr. Froedtert an option to purchase any of the Froedtert stock if it is sold. Mr. Froedtert will need at least seven shares of this stock to completely assure himself of controlling interest in the corporation. It also appears that with the entire block of decedent's stock he would have absolute control of the corporation with sole power to alter or amend the articles in such a way as to enlarge or diminish the corporate business purposes, change its name or location, increase or diminish its capital stock, change its officers or directors, or provide anything which might have been originally provided by the articles of incorporation. The fact that decedent's block of stock was not a controlling interest and that the market for it was limited does not necessarily mean that the sale of a large block will depress its value. See, Estate of

Aside from losses resulting from the sale of property made necessary in the course of administration, we see no valid reason why beneficiaries under a will should be entitled to charge the government with the cost of selling the property which they receive. Appellants' own witnesses testified that there would be some expense in selling even one share of stock as well as in selling 97,823 shares, although the expense might be greater in the latter case. Any attempt to apply the blockage theory is, in large measure, an attempt to charge off from the value of property the cost to the beneficiary of selling whatever he receives from the estate. In State ex rel. Basting v. Probate Court, 101 Minn. 485, 112 N. W. 878, this court held that where the property of an estate is committed to a trustee for a definite period of time, to be managed and controlled by him for the benefit of those to whom the property passes by will, the compensation of the trustee is not a proper item to deduct from valuation of the estate. There is slight difference, if any, between attempting to deduct the cost of using brokers to sell what a legatee receives from an estate and attempting to deduct the expense of hiring a trustee to administer what a legatee receives from an estate.

In view of our constitutional provision that "Taxes shall be uniform upon the same class of subjects,"[10] the Kentucky supreme court's analysis of the so-called blockage theory (Bingham's Admr. v. Commonwealth, 196 Ky. 318, 244 S. W. 781) demonstrates one additional reason why it should not be applied in this state. Speaking of the view that the value of stocks should be discounted when sold in large blocks, the court stated (196 Ky. 336, 244 S. W. 789):

"* * * To adopt that view * * * leads inevitably to the manifest injustice of appraising the same property for taxation at dif-

John B. Bryan, Tax Court Memo. Dec. No. 13,171, where the court held that the value of a large block of stock, which was considerably less than a controlling interest in a substantially three-family corporation, was not likely to be depressed by its limited market because existing shareholders would very likely be interested in purchasing it.

[10]Minn. Const. art. 9, § 1.

ferent values per unit on the same day against different owners, thus making the taxing value depend wholly upon the amount of such property different taxpayers may own on the taxing date in utter disregard of the constitutional guaranties * * * that taxes 'shall be uniform upon all property of the same class.' "

It is perfectly clear that allowing a discount for large blocks of stock would discriminate against beneficiaries of small estates being administered at about the same time as a large estate where the estates contain blocks of the same stock. The beneficiaries of estates including small blocks of stock would be bound by the current market prices on the date of death, since they would have no claim for blockage. Even if the blockage theory would operate fairly, the administrative difficulties in applying it should not be underestimated. There would always be the question of determining whether the size of the block is likely to raise or lower the price of the shares, and, after that, there would be the even greater problem of measuring the effect that the size of the block would have upon the price. There is no standard difference between the realization price of 97,823 shares and the market price of a 100-share block.

Another compelling reason for rejecting the blockage theory in valuing property for purposes of our inheritance tax arises out of the nature of that tax. Unlike the federal estate tax, our inheritance tax is imposed upon the privilege of receiving property rather than upon the privilege of transferring it.[11] Because our inheritance tax is imposed upon the value of what the beneficiary receives, there is as much reason to look to evidence of what the beneficiary would have to pay for the stock he receives as there is to look to evidence of what he might realize in money from selling it. None of appellants' witnesses testified that a person could go upon the market and purchase this large block of Froedtert stock at $8.25. Indeed, it is quite possible that any attempt to buy such a block of stock would cause the price to rise far above $11⅛—the value fixed

---

[11] In re Estate of Rising, 186 Minn. 56, 242 N. W. 459; In re Estate of Bowlin, 189 Minn. 196, 248 N. W. 741; In re Estate of Bigelow, 199 Minn. 239, 271 N. W. 459.

by the district court—and, in any event, there would be the cost of negotiating the purchase. These possibilities were recognized by appellants' own witnesses. It is thus demonstrated that speculation and opinions as to the possible prices at which wholesale purchases or sales could be negotiated are not a reliable guide in determining the full and true value of property that a beneficiary receives.

It should be recognized that in cases where no standardized market is shown to exist for the kind and quantity of property being valued it is pure fiction to regard the value to be determined as a market value in any real sense. In such cases, all that can be done is to determine a fair value for the property from all the relevant facts in evidence. The federal district court, sitting in Minnesota, has held that where there is no fair market for property tax assessors must determine the true value of property for taxation purposes from all factors present, although the property cannot be sold at such valuation. State of Minnesota v. Federal Reserve Bank (D. C.) 25 F. Supp. 14. See, also, State v. Penn Mut. L. Ins. Co. 198 Minn. 115, 119, 269 N. W. 37, 39, and North American Tel. Co. v. N. P. Ry. Co. (8 Cir.) 254 F. 417, 418.

In the present case, 100 shares of the Froedtert stock sold on the New York curb at the date of decedent's death for a price of $11⅛ per share. Although this sale of a small block of stock cannot be treated as controlling, it can and should be given some weight.[12] The general financial condition of the company, the influence upon the company of existing economic conditions created by World War II, the general earning record of the company, and its future prospects of operating at a profit are all factors which should reflect themselves, to some extent, in the market price of the stock on the New York curb. Accord, People ex rel. Knickerbocker F. Ins. Co. v. Coleman, 107 N. Y. 541, 14 N. E. 431.

In addition to the buying public's appraisal of these factors, which should reflect themselves to some degree in the market price

[12]See, cases cited in footnote 6 and Robertson v. Routzahn (6 Cir.) 75 F. (2d) 537.

of $11\frac{1}{8}$, the state's expert witness, Dr. Arthur R. Upgren, also made a specific analysis of those factors and testified that in his opinion the stock should be valued at $11\frac{1}{8}$. Upgren's testimony was based upon a study of numerous important factors in determining value of this company's stock. He analyzed the capital stock after considering the factors which have a bearing on its value. ation, the market outlook, the balance sheet, and the ability of the company to maintain a liquid condition. He analyzed the company's market outlook, as demonstrated by the exhibits, particularly the prospectus which the company submitted to the Securities and Exchange Commission. He observed that demand for the company's product at the date of decedent's death exceeded the supply. He analyzed the balance sheet in detail and pointed out that, whereas the company had over $5,500,000 in current assets, its current liabilities were under $2,000,000 and were largely comprised of the company's anticipated but unmatured obligation to pay federal taxes.

Although appellants have sought to discredit Dr. Upgren's testimony, we think that the trial court was entitled to give his testimony considerable weight. Dr. Upgren has an extensive background of practical experience in the investment field. He has had, in addition, extensive academic training and experience in the fields of economics and investments. His past and present work in the educational field as an authoritative writer and as a consultant of business groups and government agencies requires that he keep well informed in both the field of theory and practice. Dr. Upgren was obviously competent to express an opinion on the value of this stock after considering the factors which have a bearing on its value.

Further support is found for the trial court's determination of value in the testimony of appellants' witness Alvin R. Cord, vice president of the Froedtert company, chief accounting officer, secretary, and one of its directors, as well as a certified public accountant and management engineer. He testified that if capitalized earnings were to be used as one of the guides in determining full and true value the company's average earnings for five previous

years of $1.61 per share should be multiplied seven times in valuing the stock. That capitalization would result in a value of $11.27 per share. Another of appellants' witnesses, Paul R. Doelz, who is president of an investment banking firm, testified that he would capitalize earnings six and one-half times and that such a rate would not be unusually high. Capitalization at six and one-half would fix the value at $10.46 per share. Cord testified that the book value of the Froedtert stock was $9.15 a share.[13]

Although appellants called nine expert witnesses,[14] who testified that they would value the Froedtert stock at amounts varying from $8.25 to $9.25, the trial court was not bound to accept those opinions and disregard the other pertinent evidence, which has been outlined. Opinions as to value are not binding on the trier of fact.[15]

[13]In 2 Paul, Federal Estate and Gift Taxation, § 18.33, the use of book value in determining value of stock in estate tax cases is discussed; and, although the author cites numerous cases where book values were considered, he concludes from a study of these cases and other authorities that book values are frequently erroneous, especially in the case of closely held corporations.

[14]It is axiomatic that the trier of fact does not sit simply to count the number of experts testifying pro and con on a technical issue. Kundiger v. Prudential Ins. Co. 219 Minn. 25, 17 N. W. (2d) 49.

[15]Although appellants cite Johnson v. C. B. & N. R. Co. 37 Minn. 519, 521, 35 N. W. 438, 439, in which this court held that, "Where an article has a fixed market price, * * * testimony as to such price is as to a fact, and not to an opinion," it is obvious that the court there was referring to testimony as to actual market quotations and not to testimony of what the market price would probably be. Such testimony, however expert, is still mere opinion. Nor does the present case fall within the rule of Goedhard v. Folstad, 156 Minn. 453, 195 N. W. 281, that clear, positive, and undisputed testimony, not improbable or contradictory, given by unimpeached witnesses, cannot be rejected by the court sitting as trier of fact. Here, the opinion of appellants' experts on the question of value was contradicted by respondent's expert and by other evidence in the case. Furthermore, the testimony of appellants' witness Mr. Cord was contradictory. His opinion as to the value of the stock was $8.25 per share, but he also testified that if value were determined by capitalization of earnings he would multiply earnings seven times, giving a value of $11.27.

In addition, it is apparent that the valuations fixed by appellants' witnesses were, in large part, controlled by their mistaken view that full and true value of this stock was to be fixed chiefly by reference to its wholesale price.

■ Although there are 18 assignments of error in this case, they may all be summarized as a general assignment that the lower court's findings as to the value of the Froedtert stock are not supported by the evidence. In valuation cases, we must start with the premise stated in State v. Penn Mut. L. Ins. Co. 198 Minn. 115, 118, 269 N. W. 37, 39, that—

"It is not for this court to overthrow the finding of value of the trial court unless manifestly against the weight of the evidence."[16]

Although we review the evidence where the error assigned is that a finding of value is not supported by the evidence, we do not weigh the evidence and set aside the trial court's finding merely because we might find a different value if we were to act as a court of first instance. State v. Trask, 167 Minn. 304, 209 N. W. 18. By these tests, we think that the evidence in this case supports the trial court's finding that the full and true value of the Froedtert stock was $11⅛ at the time of Mrs. Lyng's death.

Although the trial court committed an error of law in applying the blockage theory in fixing the value of this stock, the state has not complained of the value so determined.

Order affirmed.

Mr. Justice Christianson took no part in the consideration or decision of this case.

---

It is clear that this case presents facts falling within the general rule that opinions as to value are not binding on the trier of fact. Johnson v. C. B. & N. R. Co. 37 Minn. 519, 35 N. W. 438; Remington v. Savage, 148 Minn. 405, 182 N. W. 524. See, Kundiger v. Prudential Ins. Co. 219 Minn. 25, 17 N. W. (2d) 49.

[16]Accord, State of Minnesota v. Federal Reserve Bank (D. C.) 25 F. Supp. 14, 18, and Kalscheuer v. State, 214 Minn. 441, 8 N. W. (2d) 624.