JOHN J. NEWBERRY, EDGAR A. NEWBERRY, WALTER C. SCHULZ AND JOHN J. NEWBERRY, Jr., EXECUTORS OF THE WILL OF MYRTLE H. NEWBERRY, DECEASED, PETITIONERS-APPELLANTS, v. FRANK E. WALSH, DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF TAXATION AND FINANCE, RESPONDENT.

IN THE MATTER OF THE APPEAL FROM THE TRANSFER INHERITANCE TAX ASSESSMENTS IN THE ESTATE OF MYRTLE H. NEWBERRY, DECEASED.

Argued December 19, 1955 and January 3, 1956—Decided January 23, 1956.

*Mr. Thomas L. Zimmerman* argued the cause for the petitioners-appellants.

*Mr. Joseph A. Jansen* argued the cause for the respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

BURLING, J. This cause stems from an assessment made in 1946 by the State Tax Commissioner under the provisions of the Transfer Inheritance Tax Act in effect at that time, *R. S.* 54:33–1 *et seq.* Petitioners thereafter sought a review in the Prerogative Court, *R. S.* 54:34–13, but by virtue of the subsequent abolition of that court, *Constitution* 1947, *Art.* XI, *Sec.* IV(3), the matter has recently been moved for review in the Superior Court, Appellate Division. *L.*

1948, *c.* 367, *sec.* 12. We have brought the case here prior to a disposition below. *R. R.* 1:10–1.

In 1934 the decedent, Myrtle H. Newberry, and her husband, John J. Newberry, each created two *inter vivos* trusts, identical in content except for the designation of the life beneficiaries. Both settlors were independently wealthy and one of their desires was to provide their two children with an independent income. The son, John J. Newberry, Jr., was 19 years old at the time and Myrtle Virginia, 16 years of age. The former was named as life beneficiary under two of the trusts, one created by his mother, the decedent, and the other created by his father. The daughter was similarly favored under the other two trusts created by the respective parents.

In 1935 the decedent and her husband each created two additional trusts which were substantially similar to the 1934 trusts.

The John J. Newberry Trust No. 1, dated July 6, 1934, named John J. Newberry as grantor and John J. Newberry and his wife as trustees. 2,500 shares of the common stock of the J. J. Newberry Company constituted the *res.* Income thereby realized was to be devoted to certain life insurance policies and the excess accumulated until Myrtle Virginia attained the age of 30 years. Thereafter the design was to make quarterly annual payments of income to Myrtle Virginia for life. Termination of the trust was initially geared to the death of the survivor of mother and daughter but was later amended to exclude the mother's life as a factor in this regard. The gift over was complete upon termination of the trust.

By paragraph Fourteenth of the instrument broad powers were bestowed upon the decedent by her husband:

"The Trustee Myrtle H. Newberry shall have the power at any time during her life by instrument in writing delivered by her to the Trustees to modify, alter, amend or revoke this instrument in whole or in part including the right to change the beneficiaries herein, provided, however, she shall not have power to revest the securities deposited herein, or which may be hereafter deposited herein or the

Trust Fund in John J. Newberry, the Grantor, and provided, further, that she may not revest the principal or income in the Grantor John J. Newberry."

In terms of parental desire we may look to the words of the settlor John J. Newberry to explain the reason for this paragraph:

"Q. I think it was testified by you that the purpose of the use of the power was to provide against unforeseen contingencies? A. That is true.

Q. What were those? A. At the time these trusts were made, our children were very young—they were in their teens—we were looking forward to the time when they might be married, and we wanted to be able to protect our interest in the event that they might marry some schemer or some ne'er-do-well, and that was the purpose of wanting to control the trusts."

Concerning the legal implications of the manifestation of this desire, counsel for petitioners states "they were advised that if such a power were reserved by each, the property in trust would be part of their taxable estate at death, due to the technicalities of the Federal estate tax act. There was apparently no obstacle in the statutes, Federal and State, in casting the power as a donated power, and quite naturally each selected the other as the recipient of the donated power, for they were the father and mother of the two beneficiaries."

Paragraph Fourteenth, the power provision of the trust under examination, was subsequently amended by Myrtle H. Newberry on May 31, 1943, approximately one year before her death. The amended paragraph reads:

"Fourteenth, Myrtle H. Newberry *shall have the power at any time during her life*, by instrument in writing delivered by her to the Trustees, to change the beneficiaries herein, provided, however, that such beneficiaries shall be either the descendants of Myrtle H. Newberry, spouses of such descendants or donees described in Section 812(d) of the U. S. Internal Revenue Act of 1939. Said Myrtle H. Newberry shall not have power to vest the securities deposited herein or which may be hereafter deposited herein or the trust fund in John J. Newberry, the Grantor, and provided further that she may not revest the principal or income. in the Grantor John J. Newberry." (Emphasis supplied)

At her death the decedent thus possessed the power to designate beneficiaries of the trust within a limited class. This power extended to all four trusts created by her husband, and he possessed a similar discretion in the four *inter vivos* transfers of her creation.

The State Tax Commissioner included the value of the principal of the four trusts created by John J. Newberry in the decedent's estate for inheritance tax purposes. The report of the examiner reveals that the power residing in the decedent was considered sufficient to bring the trusts "within the class of transfers taking effect at death." The principal of each trust was composed primarily of common stock of J. J. Newberry Company and an aggregate valuation of $837,549.90 was placed thereon.

Three questions must be answered in a resolution of this appeal:

(1) Would the *inter vivos* transfers of John J. Newberry be within the terms of *R. S.* 54:34–1(c) if decedent herself had created the trusts?

(2) If the first issue be answered affirmatively, does the fact that her husband was the settlor work a change in the tax incidence?

(3) Was the common stock of J. J. Newberry Company properly valued?

*R. S.* 54:34–1, in effect at decedent's death (subsequently amended by *L.* 1951, *c.* 250; *L.* 1953, *c.* 51) provided, *inter alia*:

"\* \* \* a tax \* \* \* is hereby imposed \* \* \* upon the transfer of property \* \* \* in trust or otherwise, to or for the use of any transferee, distributee or beneficiary in the following cases:

\* \* \* \* \* \* \* \*

c. Where real or tangible personal property within this State of a resident of this State or intangible personal property wherever situate of a resident of this State \* \* \* is transferred by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor \* \* \*, or *intended to take effect in possession or enjoyment at or after such death*."

The phrase emphasized is the focal point of determination.

## QUESTION ONE

We entertain no doubt that had decedent herself created the four trusts in question the statute would apply. It is only necessary to consider the scope of the power which she was free to exercise prior to her death. It is the date of death and not the date of the trust deed which governs taxability of transfers intended to take effect in possession or enjoyment at or after death. *Carter v. Bugbee*, 91 *N. J. L.* 438 *(Sup. Ct.* 1918), affirmed 92 *N. J. L.* 390 *(E. & A.* 1919). The broad power to "alter, amend, or revoke" with which decedent was initially invested was refined by her one year prior to her death. (No argument is made that this alteration was made in contemplation of death.) The consequent power was only exercisable to change beneficiaries and this was confined to a definite class. Recipients of her bounty could be any of the decedent's descendants, the spouses of her descendants, or any of numerous governmental or organizational bodies qualified within the terms of section 812(d) of the Internal Revenue Code of 1939. Thus, until her death, the ultimate beneficiaries of the trust were not certain. It was within her power to alter not only the present life estates of the two children but also the distributive scheme of the principal. Not until the death of Myrtle H. Newberry was this power extinguished.

*Plainfield Trust Co. v. McCutcheon*, 8 *N. J. Misc.* 593 *(Sup. Ct.* 1930), affirmed 108 *N. J. L.* 201 *(E. & A.* 1931), is controlling. There the decedent, a wife and mother of independent wealth, created four trusts favoring her four children. Settlor and her husband were designated trustees, and were invested with power to change the beneficiaries. Although the court held that neither could recapture the funds thus set aside, the four *inter vivos* transfers were found to come within the statutory ambit taxing transfers intended to take effect in possession or enjoyment at or after death.

Petitioners would argue that the Legislature has not undertaken to enact a provision corresponding to section

811(d)(2) of the Internal Revenue Code of 1939 which invoked the federal estate tax where enjoyment of a transferred interest was subject to change by a decedent at the date of his death. This may be acknowledged. But the contention overlooks the basis of taxability in *Plainfield Trust Co. v. McCutcheon, supra.* The foundation there was the fact that decedent had not fully exercised the privilege of succession. Not until at or after her death were the designated beneficiaries assured of their respective interests. "The privilege of succession—the 'shifting of the economic benefits and burdens of property'—is the thing taxable under the statute." *Schroeder v. Zink,* 4 *N. J.* 1, 9 (1950); *Hartford v. Martin,* 122 *N. J. L.* 283, 286 (*E. & A.* 1939). And although here the class of potential recipients was somewhat more restricted than in the *Plainfield Trust Co.* case, *supra,* the exercise of the privilege is as incomplete in the one situation as the other. The purpose of the statute is to equate *inter vivos* transfers with testamentary transfers for tax purposes where the former are designed to enjoy the benefits of the latter, *Squier v. Martin,* 131 *N. J. Eq.* 263, 268 (*Prerog.* 1942); *Avery v. Walsh,* 138 *N. J. Eq.* 80, 83 (*Prerog.* 1946), and thus to achieve an equality in the incidence of the tax burden. *Central Hanover Bank & Trust Co. v. Martin,* 129 *N. J. L.* 127, 128 (*E. & A.* 1942), affirmed *Central Hanover Bank & Trust Co. v. Kelly,* 319 *U. S.* 94, 63 *S. Ct.* 945, 87 *L. Ed.* 1282 (1943).

The transfers here, although vested, were subject to divestment at the caprice of Myrtle H. Newberry. Not until her death was the control extinguished and the gifts made certain.

### QUESTION TWO

Concluding that the statute would be applicable had Myrtle H. Newberry created the trusts which have been assessed within her taxable estate, are we to reach a different conclusion because the transfers were made by John J. Newberry?

Petitioners argue that taxability in this consequence may only be grounded upon the doctrine of reciprocal or cross trusts, *Lehman v. Commissioner*, 109 *F. 2d* 99 (2 *Cir.* 1940), and that unless the power invested in the decedent by her husband might be exercised by her for personal benefit the concept is not applicable. This novel argument undoubtedly finds its genesis in the requirement of certain of the federal courts, notably the 3rd Circuit, that a demonstration of "legal consideration" is a necessary requisite before classifying the person who provides the trust *res* as the settlor thereof, regardless of the *pro forma* creator. Indeed, the 3rd Circuit Court of Appeals reversed the determination of the Tax Court of the United States in resolving the consequence of federal death duties upon the estate *sub judice*. *Newberry's Estate v. Commissioner*, 201 *F. 2d* 874, 38 *A. L. R. 2d* 514 (3 *Cir.* 1953) reversing 17 *T. C.* 597 (*Tax Ct.* 1951). Reaffirming its position as previously stated in *In re Lueders' Estate*, 164 *F. 2d* 128 (3 *Cir.* 1947), the court stated:

"But this court * * * has taken the lead in indicating that payment for the creation of a trust by another must be real if the alleged payor rather than the apparent settlor is to be treated as grantor of the trust. The essential picture which the crossed trusts must reveal to justify the result reached by the Tax Court in the present case is a declared grantor induced to establish a trust giving the party now to be treated for tax purposes as the grantor, a power which the latter has wanted and has paid for by setting up another trust to accomplish something desired by the declared grantor. Such in our view are the rather strict confines of the Lehman doctrine." (201 *F. 2d*, at *page* 877.)

Finding only a consideration of "love and affection" in the establishment of the Newberry trusts, the court held the requirement was not fulfilled.

It is contended by the petitioners that we should apply this philosophy in the disposition of the matter *sub judice*, even though this court is not bound to do so in cases involving the New Jersey transfer inheritance tax. We are not inclined however to embrace a similar rationale. The doctrine of reciprocal trusts, so far as applicable to the field of federal and state death duties, was judicially invoked by the 2nd

Circuit Court of Appeals in *Lehman v. Commissioner, supra,* to barricade a most obvious avenue of tax avoidance. There two brothers each created two trusts, designating the other and his issue as beneficiaries. Each transferred to the other the power to withdraw $150,000 from the principal. Had the brothers retained the power in the trusts each had created the tax incidence was certain under the federal law. The court found no difficulty in appreciating the arrangement for what it was. "The fact that the trusts were reciprocated or 'crossed' is a trifle, quite lacking in practical or legal significance." [109 *F. 2d* 100.] Borrowing a statement from 1 *Scott on Trusts, sec.* 156.3 (1939), to the effect that "a person who furnishes the consideration for the creation of a trust is the settlor, even though in form the trust is created by another," the 2nd Circuit introduced the law of reciprocal trusts into the tax arena. See *Colgan & Molloy, Converse Trusts—The Rise and Fall of a Tax Avoidance Device,* 3 *Tax L. Rev.* 271 (1948); *Comment, Reciprocal Trusts in Estate and Gift Taxation,* 42 *Calif. L. Rev.* 151 (1954).

In final analysis, the divergence of thought represented by the liberal and strict interpretation of "consideration" may in truth raise the question of responsibility in meeting tax avoidance devices achieved through skillful employment of property concepts. See *Marx, The Switching of Settlors in Inter Vivos Trusts,* 26 *Taxes* 622 (1948).

██ Our courts have long taken the position that the substance of the transaction controls over the mere form of creation, *Schroeder v. Zink,* 4 *N. J.* 1 (1950); *Bose v. Division of Taxation,* 5 *N. J. Super.* 266 (*App. Div.* 1949), certification denied *In re Bose,* 4 *N. J.* 74 (1950); *Dommerich v. Kelly,* 132 *N. J. Eq.* 220 (*Prerog.* 1942), affirmed 130 *N. J. L.* 542 (*Sup. Ct.* 1943), affirmed 132 *N. J. L.* 141 (*E. & A.* 1944), and that technical tools within the law of conveyancing are not to thwart the purpose and intent of the statute, *Hartford v. Martin,* 122 *N. J. L.* 283 (*E. & A.* 1939); *The Pennsylvania Co., etc., Annuities v. Kelly,* 134 *N. J. Eq.* 120 (*Prerog.* 1943). "The range of the statute should not be so restricted as to frustrate its evident purpose." *Squier*

*v. Martin,* 131 *N. J. Eq.* 263, 269 (*Prerog.* 1942). If past judicial interpretation be contrary to present legislative will the law making process may be set in motion. *Cf. L.* 1955, *c.* 135.

■ With this philosophy in mind we experience no hesitancy in a situation such as this where the decedent and her husband sought to retain until death the power to name the ultimate recipients of the trust property—one of the essential ingredients of the proprietary right. Mr. and Mrs. Newberry were informed by their counsel that the control each desired to retain would invite a tax consequence unless the power was cast upon another. They had a mutual desire to diminish the potential *quantum* of federal and state death duties. The plan suggested met with their approval. The 1934 trusts were all executed on the same day, as were the trusts in 1935. Equal amounts of *corpus* were contributed by each of the settlors. Each settlor executed 16 amendments of similar date and content under the invested powers. Each possessed broad powers over the same amount of property transferred and until her death Myrtle H. Newberry could effectively preclude any of her issue from absolute enjoyment thereof. The fact that this control was not upon property which she had transferred is immaterial. So, too, the impossibility of beneficial recapture. *Plainfield Trust Co. v. McCutcheon, supra.* The power of selection existing until death renders the entire plan one intended to take effect in possession or enjoyment at or after death.

### Question Three

The final question presented is the valuation placed upon some 50,000 shares of the common stock of J. J. Newberry Company, 10,000 of these shares being within the trusts and approximately 40,000 shares otherwise included within the decedent's estate at her death. The State Tax Commissioner appraised the stock at $57⅛ per share based upon the closing price thereof on the New York Stock Exchange on May 9, 1944, the date of decedent's death. 300 shares were traded that day.

 Petitioners argue that the Commissioner erred in disregarding the proportions of the stock owned by the decedent and that the "blockage rule" should become one of the determinative criteria in reaching a fair appraisement by the state taxing authorities in inheritance tax matters. The rule, simply stated, merely recognizes that a large block of stock may not be as readily liquidated as a few shares. 2 *Paul, Federal Estate and Gift Taxation, sec.* 18.27 (1942). The "blockage rule" was extensively considered in *Montclair Trust Co. v. Zink,* 141 *N. J. Eq.* 401 (*Prerog.* 1948). We concur in the reasoning of Judge Jayne (then Vice-Ordinary) in his opinion therein:

"I have previously herein expressed the opinion that the enormity, mass, and volume of the stock ought in my judgment to be accorded deliberate consideration by the taxing bureau in the determination of its clear market value, but I am disinclined to recognize in all such cases the so-called blockage valuation as a dominant, much less a decisive or exclusive criterion, of taxable value. I prefer to recommend that the tax department thus enjoined and empowered to appraise and evaluate taxable assets should receive and consider relevant and competent evidence disclosing all of the pertinent conditions, qualifications, modifications, and exceptional circumstances in the given case which are modernly observed under the prevailing standards of business practices." (141 *N. J. Eq.,* at *page* 411)

"* * * Requisite proofs must embrace information concerning such matters as the amount of the outstanding stock, the number of shareholders, the recorded number of shares traded in each week or month * * *, the favorable or unfavorable technical position of the company, the attractive or unattractive state and trend of the market, etc., all of course within reasonable proximity in point of time to the essential date." (141 *N. J. Eq.,* at *page* 413)

The adoption of the "blockage rule" had been previously advocated before the Prerogative Court but rejected in *Spalding v. Martin,* 119 *N. J. Eq.* 603 (*Prerog.* 1936), apparently on the ground that the application of the rule would violate the theoretical concept of a willing but uncompelled seller and a like-minded purchaser in establishing fair value. And see *State v. Wagner,* 233 *Minn.* 241, 46 *N. W.* 2d 676, 23 *A. L. R.* 2d 762 (*Sup. Ct.* 1951). The argument against the rule is that it assumes the owner of a large block of stock must sell it on a day certain.

■ We think, however, that a necessary requisite to invocation of the blockage rule as an element of consideration in fixing fair value is a showing that a wholesale method of disposition is the only reasonable plan for realizing a fair return to the owner of the block. It is proper to require that the hypothetical sale be achieved by that method which would achieve for the seller the most favorable price based upon the facts of the individual case. If the most favorable return might be obtained by a gradual offering over a period of time, then blockage has no place in the determination. See, e. g., *Avery v. Commissioner*, 3 *T. C.* 963 (*Tax Ct.* 1944). *Cf. Bull v. Smith*, 119 *F. 2d* 490 (2 *Cir.* 1941). It is not to be summarily assumed that a larger block of stock has less value than a small block. Proof of the various factors which would reasonably indicate a prudent manner of disposition is upon the claimant. 2 *Paul, Federal Estate and Gift Taxation, sec.* 18.27 (1942).

The petitioner's expert, a recognized brokerage authority whose firm was a member of the New York Exchange, testified that in order to realize a fair price upon such a large block of stock a secondary distribution (*i. e.*, a public offering of shares outstanding handled through a brokerage representative) would be necessary and that this in itself would depreciate the market price of $57⅛ by 3 or 4 points, and that had the entire block been simply thrown on the exchange absent a broker intermediary the price might well have dropped 5 to 6 points. These basic conclusions were founded upon such factors as the caution evident among investors at this particular period, the thinness in the market for this particular stock, the fact that the book value of the stock had generally been superior to the average market price over the five years preceding May 9, 1944, that the stock did not represent a controlling interest in the company. When asked if a gradual offering of the stock in small quantities would have been successful the expert testified:

"I don't believe the market would have absorbed at anywhere near the quoted price, as much stock as there is in this estate over any reasonable period of time on the Stock Exchange. I don't be-

lieve it would have absorbed it, and I believe the specialist on the Stock Exchange would bear me out."

Respondent does not contend that the blockage theory has no place in the valuation of shares of stock for inheritance tax purposes. He argues, however, that the evidence adduced by petitioners was taken into consideration but rejected because for a period of ten months subsequent to decedent's death there was no decline in the stock; in fact, there were ready purchasers with no sellers. The figure of $57⅛ depressed by 4 points is said to represent an amount equal to the commission which would have been charged by a broker to effect a secondary distribution. Admitting that it would be reasonable to discount the value of a large block of stock which required its sale at or immediately after the death of the owner, or claim a deduction of expenses incident to a secondary distribution, respondent points out that so far as the record indicates no sale has taken place.

It is immaterial, of course, that no sale has taken place. If market value is to be an index of appraisal we necessarily deal in a hypothetical transaction so far as the claimant is concerned. The evidence submitted by the petitioners did not influence the Commissioner's determination because he was of the opinion that a healthy market for the stock in question existed, and we may infer from this that he considered a wholesale plan of disposition such as a secondary distribution would not be necessary.

During the ten years immediately preceding decedent's death the average monthly sales of J. J. Newberry Company common stock was 1,742 shares. From January 1944 through May 9, 1944 (date of decedent's death) the total shares traded totaled 3,900, ranging from a high of 61 to a low of 56. The usual daily volume was 100 shares. The largest daily volume was 1,000, which worked no adverse effect upon the stability of the price. And subsequent to May 9, 1944 it appears that the market price increased. During the balance of 1944 (from May 9 to December 31) a total of 4,600 shares were traded. Thus, during the entire year of 1944 only

8,500 shares were traded, or approximately 21% of the 40,000 odd shares owned by decedent at her death.

We conclude that a "thin" market for this stock existed. See *Estate of McKitterick*, 42 *B. T. A.* 130, 137 (*Bd. Tax App.* 1940). There was evidence that upon an offering of 300 shares subsequent to Mrs. Newberry's death the market declined 3 points. Although we accord the findings of the Transfer Inheritance Tax Bureau with the respect due to experienced judgment, *Tracy v. Alexander*, 17 *N. J.* 397 (1955), the report of the Commissioner (which was written in 1945) lacks the detail to clarify and substantiate his position upon the valuation in question. The respondent has not sought to reinforce the prior determination. Therefore the evidence adduced by the petitioners' expert to demonstrate that a secondary distribution would be the most prudent method of disposition of the large block of stock is convincing. The record sustains the contention. The valuation for inheritance tax purposes of the common stock to be included within decedent's estate will be valued at $53⅛ per share.

## CONCLUSION

The determination rendered by the Commissioner is affirmed, resulting in the inclusion of the value of the principal of the four John J. Newberry trusts in decedent's taxable estate, and reversed upon the valuation placed upon the common stock of the J. J. Newberry Company within decedent's estate, and the cause remanded for entry of an assessment in accordance with this opinion.

No costs will be taxed to either party.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*Opposed*—None.